### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-CR-00027 (CKK) (GMH)** |
| **ARTIE BYRD,** | |
| **Defendant.** | |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

Mr. Byrd appears before the Court for revocation of his supervised release following his third conviction for firearm possession in this Court. When he was sentenced in this matter—for possessing a firearm—the Honorable Colleen Kollar-Kotelly provided Mr. Byrd with a significant opportunity to better himself. Despite his prior sentences of forty- and forty-two-months' incarceration, Judge Kollar-Kotelly sentenced Mr. Byrd to just eighteen months' incarceration, with three years of supervised release. Mr. Byrd could have used that significant break to seek out employment, continued education, or otherwise make himself a contributing member of our community. He did not. Instead, Mr. Byrd has squandered that opportunity as he has previous opportunities on supervised release. Mr. Byrd continues to acquire and possess firearms in increasingly reckless manners. He has expressed no remorse or acceptance of responsibility for his most recent offense. For the following reasons, the Government requests a sentence of fourteen months' incarceration followed by two years of supervised release.

### BACKGROUND

#### *The Conduct Underlying Mr. Byrd's Conviction in this Matter*

The facts underlying Mr. Byrd's conviction in this matter are set forth in the Statement of

Offense which he and his counsel signed. *See* ECF No. 14.

On January 14, 2021, at approximately 5:45 p.m., members of the Metropolitan Police Department (MPD) Gun Recovery Unit (GRU) were on patrol when they observed a group of individuals standing closely together without masks in front of 905 Decatur Street in Northwest Washington, D.C. Officers got out of their vehicle and walked toward the group, which included an individual later identified as Artie Byrd.  At that time, Mr. Byrd had a firearm in his possession located in his right front jacket pocket. The defendant's jacket was tight fitting, which allowed an approaching officer to see an L-shaped object, bulging from his right front pocket.

During a search of Mr. Byrd's person, officers recovered the firearm from the his right jacket pocket and arrested him.  The recovered firearm was a black in color Ruger P95, 9mm handgun (serial number 31626522). When it was recovered, the gun had one round of 9mm ammunition in the chamber and eight rounds of 9mm ammunition in a magazine within the firearm. At the time of his possession of these firearms and ammunition, the defendant had previously been convicted of a crime punishable by imprisonment for a term exceeding one year, and was aware of that fact.

### *The Conduct Underlying Mr. Byrd's Violation*

In Case No. 22-CR-000309 (TNM), Mr. Byrd was convicted following a trial which elicited the following facts.  On September 2, 2022 at 11:30 PM, Mr. Byrd was the sole occupant of a Nissan Maxima driving southbound on Connecticut Avenue NW in Cleveland Park.  Officers Brady and Jaeger—patrolling in a marked MPD cruiser—saw Mr. Byrd driving with Delaware temporary tags beginning with the letters "XX."  Based on his experience, Officer Brady knew that these tags were counterfeit and the officers attempted to stop Mr. Byrd.  Mr. Byrd turned right on Macomb Street NW.  After the officers activated their emergency lights, Mr. Byrd accelerated

away at high rate, turning onto a short dead-end street.  He drove the vehicle over the curb, crashing

into and destroying a bench.

*Figure 1*



Mr. Byrd ran out of the car and along a path between 3314 and 3315 Ross Place NW.  He

ran into the backyard first left and then right, dropping a Smith & Wesson semi-automatic

handgun, loaded with one round in the chamber and fourteen rounds in the magazine.  After

tossing the gun, Mr. Byrd surrendered to the officers.  Officers traced Mr. Byrd's flightpath and

found the gun he had discarded on the back patio.

*Figure 2*



Mr. Byrd informed officers on scene that the car belonged to him and that he was driving the car alone. In the vehicle, officers found a single zip of a substance that field-tested positive for cocaine base and a digital scale with white powder residue. Mr. Byrd had $498 in cash on his person.

*Figure 3*



During his conversation with officers, Mr. Byrd appeared to be under the influence of something

as he slurred his words and at times had his eyes closed.[1]

Despite conceding that Mr. Byrd committed another federal crime while on release, defense counsel appears to challenge his conviction in Case No. 22-CR-000309 (TNM).  *See* ECF No. 55 at 4-6.  While the Government does not believe this is the appropriate forum to relitigate that conviction, the Government addresses those issues briefly.

Mr. Byrd was initially tried in this matter on January 31, 2024.  Mr. Byrd did not call any witnesses at that trial.  Despite that, without any evidence in the record, and despite the fact that Mr. Byrd told police on scene that no one else was with him that evening, defense counsel for the first time in closing asserted that a third party was with Mr. Byrd and possessed the firearm.  *See* February 3, 2023 Tr. 33-34, attached as Exhibit A.  Additionally, notwithstanding the fact that Mr. Byrd did not testify, in closing, defense counsel made a series of statements referencing how Mr. Byrd felt during his flight from police officers:

- Exhibit A at 29:  Let's talk about the reason why Mr. Byrd did not stop that night. Here we have a young African-American man driving in his 2005 Nissan through upper Northwest D.C., when he looks in his rear-view mirror and sees the thing that for reasons we can all understand and empathize with strikes so much fear in folks that look like him.

- Exhibit A at 29:  Ladies and gentlemen, we've all seen the videos. We've all read the hashtags. These are all the things that are going through Mr. Byrd's mind at that time.

Following deliberations, the jury was hung with nine of twelve jurors indicating that Mr. Byrd was guilty beyond a reasonable doubt.  Notably, the Government had not introduced Mr. Byrd's statement that he was alone in the vehicle during the first trial.  The Government decided to re-try Mr. Byrd and introduce this statement proving conclusively that it was Mr. Byrd, and Mr. Byrd alone, that had driven the car and possessed the firearm.

At the second trial, defense counsel opened by telling a first-person narrative from Mr.

---

[1] Officers did not conduct a field sobriety test given the fact that Mr. Byrd had fled both in a vehicle and on foot and was in possession of a firearm.

Byrd's perspective about an evening he spent with his girlfriend eating dinner, picking up his cousin, and claiming that the firearm belonged to his cousin who had flung the gun and then fled the scene, unobserved by any officers or surveillance video.  Defense counsel did so even though they never intended on calling any witness to corroborate this story:  not Mr. Byrd's girlfriend, not Mr. Byrd's cousin, and not Mr. Byrd.  Following openings, the Government objected, noting that none of this could be proven absent witness testimony.  Defense counsel improperly attempted to bolster their story by showing pictures of a scooter in the back of the car without ever intending to offer any testimony to corroborate any other details of their story, and by calling an officer to testify as to the existence of the scooter.  The Court properly excluded this evidence.  *See* September 26, 2023 Tr. at 171-178, attached as Exhibit B.  Defense counsel also attempted to introduce evidence of Mr. Byrd's state of mind, specifically that he fled from police not because of the firearm, drug residue, his intoxication, or his counterfeit registration, but because he was a black man in Washington, D.C.  The Court properly excluded these arguments because no witness had testified as to Mr. Byrd's state of mind at the time of the offense.  *See* Exhibit B at 208.  Mr. Byrd was convicted.

### *The Pre-Sentence Investigation Report*

While no Pre-Sentence Investigation Report (PSIR) was prepared for this proceeding, a PSIR was recently prepared for Mr. Byrd's sentencing in Case No. 22-CR-000309 (TNM), ECF No. 100, and summarizes Mr. Byrd's personal and criminal history.  Mr. Byrd is 31-years old and was born in Washington, D.C.  PSIR at 3 and 15.  Mr. Byrd reports having a "decent and nice" upbringing.  PSIR at 16.  He was primarily raised by his mother, though his father was a part of his life.  *Id.*  Mr. Byrd was expelled from high school in the 9th grade but earned his GED while incarcerated.  PSIR at 19.  He has previously worked in a variety of jobs including at a

restaurant, Giant grocery store, as a laborer, and as a cook.  PSIR at 19-20.  While Mr. Byrd has

a history of using controlled substances, he has denied having any addictions.  PSIR at 18.  Mr.

Byrd was shot in the leg in 2017 or 2018.  PSIR at 17.

On June 24, 2010, Mr. Byrd pled guilty to Robbery in D.C. Superior Court Case No.

2010 CF2 007647.  There, Mr. Byrd and an accomplice assaulted a juvenile and stole cash, a

credit card, a cell phone, sweater, and baseball cap.  He was sentenced pursuant to the Youth

Rehabilitation Act to forty months incarceration with sixteen months suspended.  Three months

after he was released from prison, his probation was revoked. Mr. Byrd failed to take advantage

of the YRA.

On June 5, 2013, Mr. Byrd was convicted of Unlawful Possession of a Firearm and

Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term

Exceeding One Year in D.C. District Court Case No 12-CR-280.  There, Mr. Byrd was found to

be in possession of a loaded .380 caliber pistol, ten rounds of ammunition, and 3.6 grams of

cocaine base.  This conviction marked the first time he was convicted of possessing a gun while

on supervised release.  Mr. Byrd was sentenced to forty-two months of incarceration, followed

by three years of supervised release.  While on supervised release, he tested positive for illicit

substances.  His supervision expired on January 22, 2019.

As noted above, in this matter, on March 26, 2021, Mr. Byrd pled guilty to Unlawful

Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by

Imprisonment for a Term Exceeding One Year in D.C. District Court Case No 21-CR-27.  This

conviction marked the second time he was convicted for possessing a gun while on supervised

release.  Mr. Byrd was sentenced to eighteen months of incarceration followed by three years of

supervised release.

In addition to his convictions, the PSIR reflects additional charges that were dismissed as part of plea agreements including Possession with Intent to Distribute Marijuana and Unlawful Entry of a Motor Vehicle.

## ARGUMENT

When imposing sentence for a revocation of supervised release, the Court considers "the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7)." 18 U.S.C. § 3583(e). Those factors are "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct; . . . to protect the public from further crimes of the defendant; and . . . to provide the defendant with needed educational vocational training, medical care, or other correctional treatment in the most effective manner," *id.* § 3553(a)(2)(B)–(D); applicable Sentencing Guidelines and pertinent policy statements, *id.* § 3553(a)(4)–(5); "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," *id.* § 3553(a)(6); and "the need to provide restitution to any victims of the offense," *id.* § 3553(a)(7).

With respect to whether a revocation sentence should be imposed concurrent or consecutive to any other sentence, the U.S. Sentencing Guidelines are clear: "Any term of imprisonment imposed upon the revocation of probation or supervised release *shall be ordered to be served consecutively* to any sentence of imprisonment that the defendant is serving, whether or not the sentence of imprisonment being served resulted from the conduct that is the basis of the revocation of probation or supervised release." U.S.S.G. § 7B1.3(f) (emphasis added). A sentencing judge, however, maintains discretion to impose any sentence, including

revocation sentences, consecutively or concurrently.  *See Setser v. United States*, 566 U.S. 231, 236 (2012).

## THE APPLICABLE SENTENCING GUIDELINES

Mr. Byrd has admitted to a Grade B violation of the terms of his supervised release. Specifically, Mr. Byrd committed another federal crime while on supervision.  The maximum term of imprisonment for such a violation is twenty-four months' imprisonment and the maximum term of supervised release is thirty-six months, as the crime he committed is a Class C felony.  *See* 18 U.S.C. § 3583(b)(2) and (e)(3).  Mr. Byrd's criminal history at the time he was originally sentenced in this matter was Category III (6 points).  Therefore, Mr. Byrd's Guideline's range is eight to fourteen months' imprisonment.  *See* U.S.S.G. §7B1.4(a).

## THE GOVERNMENT'S SENTENCING RECOMMENDATION

The Government recommends that the Court sentence Mr. Byrd to fourteen months of imprisonment followed by two years of supervised release.  This sentence reflects the serious nature of this offense, the repetitive and dangerous history of Mr. Byrd's other criminal offenses, his repeated failure to take any responsibility for his actions and provides adequate deterrence to others in the community given the proliferation of firearms in our city.

### A.  Nature and Circumstances of the Offense.

Mr. Byrd has been convicted of carrying a loaded and deadly weapon in a reckless and dangerous manner.  Mr. Byrd engaged with officers in a high-speed chase while carrying this deadly firearm all while under the influence.  He did not stop fleeing when he hopped the curb and smashed his car into a bench.  Instead, he took that loaded weapon, jumped out of the car, and continuing running, circling two dark houses at night while officers pursued him.  Only when he had exhausted his options did he carelessly fling that loaded firearm onto a stone patio.

While this offense is a possessory one, our courts have repeatedly warned against discounting the inherent danger associated with loaded firearms. *See United States v. Blackson*, No. 23-CR-25 (BAH), 2023 WL 1778194, at *7-8 (D.D.C. Feb. 6, 2023), *aff'd*, No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023) (the absence of evidence of "use" "does little to detract from" the danger posed by a firearm "loaded with 19 rounds of ammunition in an extended magazine, . . . more ammunition than the gun was originally manufactured to carry, thereby increasing its potential to do greater harm" and placement "at the ready, on his person, and easily within reach").  And Congress recently indicated how seriously these offenses should be taken when it increased maximum sentences for 18 U.S.C. 922(g) from ten years to fifteen years.

The manner in which Mr. Byrd possessed this deadly weapon presented a real danger to our community from the individuals who lived in the residences surrounding this offense to the officers who pursued Mr. Byrd first in his vehicle and then on foot.  This gun was not secured in a gun locker or even in the car's glove box.  This gun was on Mr. Byrd's person, loaded and at the ready.  It was on his person as he engaged officers in a vehicle pursuit and on foot.  It was on his person as he was apparently under the influence operating that vehicle and as he crashed that vehicle over a curb and into a bench.  And when Mr. Byrd chose to dispose of this deadly weapon, he did not do it safely:  flinging it onto a stone patio.  The residents whose bench was destroyed and who had a gun left in their backyard for the first time in fifty years were not home.  But they did tell the Government that occasionally children walked through that area.  Mr. Byrd had no idea what could have happened with that gun.  Had police not found and secured the gun, it could have been discharged or been found by a child.  Mr. Byrd did not care.

Further, arguments concerning "mere possession" ignore the current epidemic of gun

violence in our community.[2]  A loaded firearm is a deadly weapon.  It has the ability with a single pull of the action to end a life.  A firearm can escalate a mundane disagreement or a petty offense into a deadly encounter.

Mr. Byrd's continued possession of firearms justifies a significant revocation sentence.

**B.  The History and Characteristics of the Defendant.**

Mr. Byrd has not been convicted three times for possessing a firearm while on supervised release.  Indeed, this is his third conviction for the unlawful possession of a firearm in *this very court*.

Mr. Byrd's first adult conviction came in 2010 at age 18 when he and a co-conspirator forced a juvenile to the ground, held him down, and forcibly took his money, credit card, phone, backpack, and clothing.  But his crimes only continued from there, on November 29, 2012, while on supervision for the robbery, he was found in possession of a firearm, ammunition, and cocaine base.  As with the instant offense, he was only stopped after he ran causing police to chase him on foot.

Mr. Byrd has previously been shot.  But seeing the deadly and destructive power of an illegal firearm did nothing to deter Mr. Byrd from obtaining another illegal firearm.  In January 2021, Mr. Byrd was found in possession of yet another illegal and loaded firearm.  Following a term of imprisonment and while on supervision, Mr. Byrd was once again found with a different

---

[2] *See, e.g.*, Peter Hermann, *Homicides are falling in many big cities.  In D.C., they're rising.*, Wash. Post (August 19, 2023, 9:00 a.m.), https://www.washingtonpost.com/dc-md-va/2023/08/19/dc-homicides-rising-major-cities/ ("But more than halfway through this year, killings in the District are surging toward numbers not seen in two decades . . . ."); Matt Gregory, *Tale of two cities: Homicides down in Baltimore, up in DC*, WUSA9 (December 28, 2023), https://www.wusa9.com/article/news/local/homicides-go-down-in-baltimore-less-than-300-dc-homicides-hit-20-year-high/65-14e1f98e-d82c-4878-a5c0-9ac461c47899 ("At the time this article was written DC Police had investigated 271 homicides so far this year, according to the Metropolitan Police Department (MPD.) This time last year the city was at 199.")

illegal and loaded firearm, along with apparent cocaine base and a digital scale.

Mr. Byrd's history and characteristics justify a lengthy revocation sentence.

## C. The Need for the Sentence Imposed.

The requested sentence is sufficient but no greater than necessary to meet the goals of sentencing. The sentence provides specific deterrence: it will keep our community safe from Mr. Byrd for a significant period of time. It provides general deterrence: it will signal to the community that the possession of illegal firearms is a deadly serious matter and hopefully deter others from doing so. And it provides an opportunity for Mr. Byrd to reflect on the serious and repetitive nature of his crimes.

Over the last 13 years, Mr. Byrd has carried multiple illegal firearms, twice while also in possession of controlled substances. Despite knowing better than most the deadly power of firearms—having been shot—Mr. Byrd continues to obtain illegal firearms. Mr. Byrd's previous terms of incarceration and supervision have done nothing to stem his criminal activity. In his conviction for this case, Mr. Byrd received a significant break: a sentence of just 18 months' incarceration. But as with his previous convictions, however, Mr. Byrd squandered this opportunity.

Mr. Byrd has expressed no remorse for this crime. Instead, based on his sentencing submission, he continues to make excuses for his conduct or fabricate stories exonerating him. He is a thirty-one-year old man who is still possessing guns, while also driving intoxicated in a car with counterfeit registration. These are the same type of behaviors for which he has already been convicted and served time. But now, he no longer has the excuse of youth or impulsiveness.

The question for the Court is whether Mr. Byrd's conduct and criminal history is so comparatively minor that he deserves a significant variance downward. The answer is clearly

no.  Mr. Byrd's history of repeated gun offenses is worthy of the top of the applicable Guidelines.  The requested sentence of fourteen months' imprisonment is a justified and reasonable one to deter Mr. Byrd, and those who would follow in his footsteps, from future offenses.

## **<u>CONCLUSION</u>**

For all of the foregoing reasons, the Government respectfully requests that this Court sentence Mr. Byrd to a term of imprisonment of fourteen months followed by two years of supervised release.

Respectfully submitted,
MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052


Dated: May 16, 2023            By:     <u>/s/ Cameron A. Tepfer</u>
                                       Cameron A. Tepfer
                                       D.C. Bar No. 1660476
                                       Assistant United States Attorney
                                       United States Attorney's Office
                                       for the District of Columbia
                                       601 D Street NW
                                       Washington, D.C. 20530
                                       (202) 258-3515
                                       Cameron.Tepfer@usdoj.gov